Lubin QUINONES, Plaintiff-Appellant,

v.

PENNSYLVANIA GENERAL INSURANCE COMPANY, Defendant-Appellee.

Lubin QUINONES, et al, Plaintiffs-Appellees,

v.

PENNSYLVANIA GENERAL INSURANCE COMPANY, Defendant-Third-Party Plaintiff-Appellant,

v.

William G. MOWAD, Third-Party Defendant-Appellee.

Nos. 85–1665, 85–1680.

United States Court of Appeals, Tenth Circuit.

Nov. 10, 1986.

Norman E. Todd (Keith S. Burn with him on the brief) of Keith S. Burn, P.A., Las Cruces, N.M., for plaintiff-appellant.

Neil E. Weinbrenner of Weinbrenner, Richards, Paulowsky & Sandenaw, P.A., Las Cruces, N.M., for defendant-appellee

and defendant-third-party plaintiff-appellant.

Temple B. Ingram, Jr. of Studdard, Melby, Schwartz, Crowson & Parrish, El Paso, Tex., for third-party defendant-appellee.

Before BARRETT, McKAY and TACHA, Circuit Judges.

McKAY, Circuit Judge.

## I. *Facts*

The plaintiff, Lubin Quinones, a resident of Dona Ana County, New Mexico, filed this action on an uninsured motorist policy issued by the defendant, Pennsylvania General Insurance Company (Penn General), a corporation organized under the laws of Pennsylvania, in the District Court of Dona Ana County, New Mexico. The action arose out of a claim for damages from an automobile collision occurring in El Paso, Texas, between plaintiff's vehicle and one driven by an uninsured motorist, William George Mowad, who is a citizen and resident of El Paso. Penn General removed the suit to the United States District Court for the District of New Mexico and filed a third-party complaint for indemnification or subrogation against Mr. Mowad. In addition, Penn General filed a motion to transfer the case to the United States District Court for the Western District of Texas. This motion was denied by an order directing that the case be tried in Las Cruces, New Mexico.

The third-party defendant, Mr. Mowad, was served pursuant to Rule 4(f) of the Federal Rules of Civil Procedure in El Paso, Texas, which is located approximately forty miles from Las Cruces, New Mexico. Mr. Mowad filed a motion to dismiss the third-party complaint, asserting that the court lacked personal jurisdiction and that Fed.R.Civ.P. 4(f) was unconstitutional if interpreted so as to expand personal jurisdiction beyond a state's boundary as opposed to merely prescribing satisfactory service of process in certain delineated situations. The trial court granted this motion and dismissed the third-party complaint.

The case was actually tried in Albuquerque, New Mexico. A Judgment on Special Verdict was entered, reflecting that Mr. Mowad was 100% negligent and that such negligence was the proximate cause of damage to Mr. Quinones. The jury found that Mr. Quinones had suffered damages in the amount of $25,000.00, and judgment was entered against Penn General for that amount plus costs and interest.

Plaintiff, Lubin Quinones, appeals the trial court's rulings disallowing certain testimony with respect to the extent of his economic loss. He also appeals the court's refusal to instruct the jury that recovery for past medical expenses is allowable even though such expenses had already been paid by Penn General under a separate clause in the insurance contract.

The defendant and third-party plaintiff, Penn General, appeals the dismissal of its third-party complaint against Mr. Mowad for lack of personal jurisdiction. In the alternative, if this court does not reverse the trial court's dismissal of the third-party complaint, it appeals the trial court's refusal to transfer the case to El Paso, Texas. We examine each contention in turn.

## II. *Evidentiary Rulings*

Mr. Quinones was a self-employed watch repairman who owned a watch repair and jewelry store from 1970 to 1981 known as The Little Shop. He performed the watch repair work for the shop. After the 1981 accident, he was unable to continue working at his trade. To prove the loss-of-earning-capacity component of his damages, he attempted to introduce testimony from three witnesses, all of which was disallowed by the trial court. The primary evidence left before the jury establishing the dollar value of his loss of earning capacity was his income tax returns for the years 1978 through 1981, showing income of $1,548, $4,743, $0, and $0, respectively.

First, Mr. Quinones appeals the trial court's exclusion of certain testimony of Mr. Glenn Cutter, the operator of two jewelry stores for whom Mr. Quinones had performed some contract watch repair work in the 1970's. At the time of trial in

1985, Mr. Cutter employed a full-time watchmaker to do such work. When Mr. Cutter was asked how much he paid his current watchmaker, the court sustained Penn General's objection that this testimony failed to show the earning capacity of Mr. Quinones.

■ An evidentiary ruling will only be reversed if the record shows that the trial court abused its discretion. *Fortier v. Dona Anna Plaza Partners*, 747 F.2d 1324, 1331 (10th Cir.1984); *Rasmussen Drilling, Inc. v. Kerr-McGee Nuclear Corp.*, 571 F.2d 1144, 1149 (10th Cir.), *cert. denied*, 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171 (1978). Mr. Quinones' counsel failed to lay a foundation regarding when Mr. Cutter last used the services of Mr. Quinones and what he paid him, and also failed to make an offer of proof as required under Fed.R.Evid. 103(a)(2). There is nothing in the record which demonstrates that a 1985 salary paid by Mr. Cutter to his full-time watchmaker was relevant to Mr. Quinones' loss of earning capacity sustained in 1981. Since "the determination of whether proffered evidence is relevant is a matter committed to the discretion of the trial court," *Beacham v. Lee-Norse*, 714 F.2d 1010, 1014 (10th Cir.1983), we find that the trial court in this instance did not abuse its discretion in disallowing Mr. Cutter's testimony. *See also Whiteley v. OKC Corp.*, 719 F.2d 1051, 1057 (10th Cir.1983).

Second, Mr. Quinones appeals the trial court's exclusion of certain testimony of Mr. Quinones himself concerning the fate of his shop, which closed in 1981. Penn General asserts that such evidence is directed toward proving lost business profits or loss of going-concern value of Mr. Quinones' business rather than toward proving Mr. Quinones' lost earning capacity. Since a claim for lost profits in a torts case constitutes special damages which must be specifically stated under Fed.R.Civ.P. 9(g), and neither the complaint nor the pretrial order contained a claim for these damages, Penn General argues that the trial court's ruling was correct. *See Moore v. Boating Industry Associations*, 754 F.2d 698, 717

(7th Cir.1985) (lost profits considered special damages in tort case); *Burlington Transp. Co. v. Josephson*, 153 F.2d 372, 377 (8th Cir.1946) (must allege specific facts showing special damages under Fed. R.Civ.P. 9(g) to apprise defendant of nature of claim against him). Mr. Quinones counters that harm to the business that he owned and in which he worked can be recovered as part of lost earning capacity.

■ We need not reach the somewhat thorny issue of whether the business' loss of revenues represent losses due to Mr. Quinones' inability to repair watches, and thus may be a probative measure of his lost earning capacity, or whether the evidence of decreased revenues speaks only to a lost profits claim, which Mr. Quinones failed to specially plead. The only discussion in the record regarding decreased business revenue was as follows:

[Mr. Todd:] Do you still own The Little Shop in Las Cruces?

[Mr. Quinones:] No, sir, not any more.

[Mr. Todd:] What happened to The Little Shop?

Mr. Weinbrenner: I am going to object to that. There is no claim for loss—

The Court: Sustained.

Record, vol. 2, at 63. This cursory reference to The Little Shop's demise without an adequate foundation supporting its relevance with respect to lost earning capacity, and without an offer of proof to demonstrate such relevance, leaves us with no alternative under the cases cited above but to find that the trial court did not abuse its discretion in sustaining Penn General's objection and disallowing the evidence.

Finally, Mr. Quinones appeals the trial court's exclusion of certain testimony of an economist, John Meyers, Ph.D., regarding Mr. Quinones' lost earning capacity. In order to determine Mr. Quinones' future lost income, Dr. Myers attempted to extrapolate from published United States Department of Labor statistics on hourly wage figures for workers in the industrial category of "production workers in jewelry manufacturing." Record, vol. 2, at 114. No Department of Labor data were avail-

able which specifically reported on watchmakers or watch repairmen. The court disallowed the testimony as irrelevant, finding that there was no proper foundation for using the wage figures for factory workers who manufactured jewelry in computing the lost income of a self-employed watch repairman.

■ Mr. Quinones argues that Dr. Meyers' testimony was proper under Fed.R. Evid. 702 and 703, which deal with the admissibility of expert testimony. The admissibility of such testimony, however, is within the broad discretion of the trial court, and a district court's admission or exclusion of expert testimony is reviewed for abuse of discretion only. *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962); *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1523 (10th Cir. 1984), *aff'd on other grounds*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985); *Ramsey v. Culpepper*, 738 F.2d 1092, 1101 (10th Cir.1984); *United Telecommunications v. American Television & Communications Corp.*, 536 F.2d 1310, 1317 (10th Cir.1976). We find that the trial court did not abuse its discretion in excluding Dr. Meyer's computations, which used hourly wage rates related to the manufacture of jewelry.

### III. *Past Medical Expenses*

The court instructed the jury that future medical expenses were recoverable but refused to instruct that past medical expenses, which had already been reimbursed by Penn General under the policy's medical pay provisions, were recoverable again under the uninsured motorist provisions. Mr. Quinones argues that he is entitled to recover his past medical expenses twice from Penn General under a "collateral source" theory. He reasons that since such expenses would be recoverable against Mr. Mowad, they should be recoverable against Penn General under the uninsured motorist clause, regardless of whether they are also reimbursed under the medical pay provisions.

In general, the collateral source rule states:

Where a plaintiff is compensated for his injuries by some source independent of the tortfeasor—insurance, for example—the general rule is that the plaintiff is still permitted to make a full recovery against the tortfeasor himself, even though this gives the plaintiff a double recovery or even a recovery for losses he never had at all.

D. Dobbs, *Handbook on the Law of Remedies* § 8.10, at 581 (1973). Thus, in a suit against Mr. Mowad, Mr. Quinones would be able to recover his past medical expenses, notwithstanding the fact that his own insurance policy already reimbursed him for these losses. *See Walker v. Missouri Pacific Railroad*, 425 S.W.2d 462, 464 (Tex. Civ.App.1968). However, although Mr. Quinones would be able to recover twice, the tortfeasor would only have to pay once.

The rule evolved around the commonsense notion that a tortfeasor ought not be excused because the victim was compensated by another source, often by insurance. The collateral source rule removes the disincentive otherwise faced by potential victims to insure against harm or to accept gratuitous compensation from sources other than the tortfeasor for fear that the tortfeasor will not then be required to pay.

■ The posture of the present case dictates that application of the collateral source rule would be inappropriate. This is not a suit against the tortfeasor in which we wish to avoid rewarding the tortfeasor by reducing his liability because of the happenstance that the plaintiff possessed the foresight to purchase insurance. The defendant in this action, Penn General, is also the "collateral source." No policy would be served by requiring Penn General to twice pay Mr. Quinones' past medical expenses. Even in the prototypical collateral source case, the tortfeasor is required to pay only once. In fact, when the collateral source is somehow identified with the tortfeasor, the collateral source rule is inapplicable in a suit against the tortfeasor. In effect, the source is not sufficiently collateral to or independent of the tortfeasor;

it is as if the tortfeasor himself paid. In such cases, the tortfeasor's liability *is* reduced by the amount of payment made. *See Yarrington v. Thornburg,* 8 Storey 152, 58 Del. 152, 205 A.2d 1 (1964).

While Penn General is not the tortfeasor in this case, and so the cases stating the above principle are not quite analogous, the underlying reasoning compels the same conclusion here. When the tortfeasor is the defendant, and a source sufficiently identifiable with the tortfeasor pays the plaintiff, we are not "excusing" the defendant from liability when we forego the collateral source rule and reduce his liability by the amount he, in essence, has already paid. The goals underlying the collateral source rule would not be served by its application in that case. On the contrary, it would have the undesired result of dissuading those identified with the tortfeasor from coming forward and offering the victim compensation.

Similarly, we are not "excusing" Penn General from liability when we forego the collateral source rule in this case; it has completely reimbursed Mr. Quinones' past medical expenses. Just as the rule's goal is not to reimburse plaintiffs twice, though oftentimes that is its effect, its goal is not to charge defendants twice, either. Therefore, we hold that the trial court was correct in refusing to instruct the jury that Mr. Quinones could twice recover his past medical expenses from Penn General.

## IV. *Dismissal of Third-Party Complaint*

When Penn General was sued by Mr. Quinones in Las Cruces, New Mexico, it, in turn, filed a third-party complaint against the uninsured motorist, Mr. Mowad, pursuant to Fed.R.Civ.P. 14. Mr. Mowad was served process in El Paso, Texas, as prescribed by Fed.R.Civ.P. 4(f). This latter rule, entitled "Territorial Limits of Effective Service," states in pertinent part:

> All process other than a subpoena may be served anywhere within the territorial limits of the state in which the district court is held, and, when authorized by a statute of the United States or by these rules, beyond the territorial limits of that state. In addition, persons who are brought in as parties pursuant to Rule 14, or as additional parties to a pending action or a counterclaim or cross-claim therein pursuant to Rule 19, may be served ... at all places outside the state but within the United States that are not more than 100 miles from the place in which the action is commenced, or to which it is assigned or transferred for trial....

It is undisputed that Mr. Mowad resided and was served process within 100 miles of both the United States District Courthouse in Las Cruces, New Mexico, and the State District Court of Dona Ana County, where this suit was originally commenced. It is also undisputed that Mr. Mowad did not reside in New Mexico, nor was he doing business in New Mexico, nor did he have an office or agent in New Mexico, nor did the tortious incident occur in New Mexico. Thus, he was beyond the reach of the New Mexico long arm statute.[1]

Mr. Mowad moved the trial court in New Mexico to dismiss the third-party complaint

---

**1.** If Mr. Mowad had been within the confines of the New Mexico long arm statute, service could have been made pursuant to Fed.R.Civ.P. 4(e), which provides for out-of-state service in conformity with a "statute or rule of court of the state in which the district court is held." The New Mexico long arm statute provides in pertinent part:

> A. Any person, whether or not a citizen or resident of this state, who ... does any of the acts enumerated in this subsection thereby submits himself ... to the jurisdiction of the courts of this state as to any cause of action arising from:

> (1) the transaction of any business within this state;
> (2) the operation of a motor vehicle upon the highways of this state;
> (3) the commission of a tortious act within this state; ....

> B. Service of process may be made upon any person subject to the jurisdiction of the courts of this state under this section by personally serving the summons upon the defendant outside this state and such service has the same force and effect as though service had been personally made within this state.

> C. Only causes of action arising from acts enumerated in this section may be asserted

under Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction. The court granted this motion, finding that an exercise of personal jurisdiction would violate due process requirements, since Mr. Mowad had no contacts with the forum state. *See International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The court rejected Penn General's argument that since Mr. Mowad could be effectively served under Rule 4(f), the court thereby gained personal jurisdiction. The court concluded that a rule of civil procedure pertains only to service rather than amenability to suit and is not capable of enlarging the court's jurisdiction 100 miles beyond the territorial boundary of the state. *See* Order, Record, vol. 1, at 35.

Both parties have agreed on brief on the precise issue to be decided here: What is the minimum contacts territory when a third-party defendant is served under Fed. R.Civ.P. 4(f)? Mr. Mowad argues that, absent a congressional statute explicitly expanding the personal jurisdiction of a federal court,[2] a third-party defendant must have minimum contacts with the forum state in order to satisfy due process. Penn General, on the other hand, submits that minimum contacts with the 100–mile bulge area is sufficient to subject the limited class of parties described in Rule 4(f) to the personal jurisdiction of the district court in the forum state.

The number of cases considering the matter is understandably limited, since it is a fairly rare occurrence that a party of the circumscribed class described in Rule 4(f) would fail to have minimum contacts with the forum state, rendering service pursuant to Fed.R.Civ.P. 4(e) under the forum state's long arm statute unavailable, and yet have such contacts with the 100–mile bulge area. It is only in this narrow class of cases in which Rule 4(f) would have to stand as the only basis for exercising personal jurisdiction over Rule 14 and Rule 19 parties.[3]

■ Both the Fifth and the Second Circuits have considered the issue. In *Sprow v. Hartford Insurance Co.,* 594 F.2d 412, 417 (5th Cir.1979), the Fifth Circuit held that "a meaningful nexus with the bulge area *or* forum state" satisfies due process. (Emphasis in original.) Writing for the court in *Coleman v. American Export Isbrandtsen Lines,* 405 F.2d 250, 252 (2d Cir.1968), Judge Friendly looked to the minimum contacts of the third-party defendant with the entire state in which bulge service occurred, holding that if the state of service would have personal jurisdiction, the forum state could obtain jurisdiction through Rule 4(f) service. All lower court opinions that have been found, but one, agree with the holding in either *Sprow* or *Coleman. See Paxton v. Southern Pennsylvania Bank,* 93 F.R.D. 503 (D.Md.1982); *Jacobs v. Flight Extenders, Inc.,* 90 F.R.D. 676 (E.D.Pa.1981); *Pillsbury Co. v. Delta Boat & Barge Rental, Inc.,* 72 F.R.D. 630 (E.D.La.1976); *Spearing v. Manhattan Oil Transportation Corp.,* 375 F.Supp. 764 (S.D.N.Y.1974); *Pierce v. Globemaster Baltimore, Inc.,* 49 F.R.D. 63 (D.Md.1969); *McGonigle v. Penn-Central Transportation Co.,* 49 F.R.D. 58 (D.Md.1969). The single lower court opinion adhering to the

against a defendant in an action in which jurisdiction is based upon this section. N.M.Stat.Ann. § 38–1–16 (1978).

2. There are numerous federal statutes which provide for service of process beyond the territorial limits of the state in which the district court sits. *See* 2 *Moore's Federal Practice* ¶ 4.42[2], at 4–386 to –391 (2d ed. 1986). Mr. Mowad does not maintain that these statutes fail to confer personal jurisdiction over the parties in the forum court. Rather, he argues that a rule of procedure promulgated by the Supreme Court cannot accomplish the same thing.

3. Under Mr. Mowad's interpretation of the proper role of Rule 4(f), the Rule's utility would be even more narrowly defined. He suggests that Rule 4(f) could only be appropriately used in those situations where a Rule 14 or Rule 19 party is "present" in a forum state, thus satisfying a minimum contacts inquiry, but the claim did not arise out of activities in the forum state. If the forum state's long arm statute requires a nexus between a claim and forum activities, it would be unavailable; only then could Rule 4(f) supply a means to effectively serve process on the Rule 14 or Rule 19 party. *See* Third-Party Defendant-Appellee's Answer Brief at 7–8.

position advocated by Mr. Mowad and with which the lower court agreed in this case, *Karlsen v. Hanff,* 278 F.Supp. 864 (S.D.N.Y.1967), was later overruled by the Second Circuit in *Coleman.* We agree with the result in this body of cases and hold that if a party delineated in Rule 4(f) has minimum contacts with the 100–mile bulge area, the district court in the forum state gains personal jurisdiction over such party through service of process pursuant to Fed.R.Civ.P. 4(f), providing due process is satisfied.

Mr. Mowad asserts that interpreting Rule 4(f) as extending the territorial limits of the district court's jurisdiction, even if only in the narrow circumstances described in Rule 4(f), violates separation of powers doctrine in that only Congress is constitutionally authorized to establish the lower federal courts and the limits of their jurisdiction, while Rule 4(f) was promulgated by the Supreme Court. This position misperceives both the role Congress played in the promulgation of these rules and the force and effect of these rules.

The Federal Rules of Civil Procedure were drafted by the Supreme Court pursuant to a congressional act.[4] Congress retained the power to veto any such rule by suspending its effectiveness until ninety days after it has been reported to Congress. The Supreme Court held in *Sibbach v. Wilson & Co.,* 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed.479 (1941), that Congress could lawfully exercise its power to regulate the practice and procedure of the federal courts by delegating to the Supreme Court the authority to make rules not inconsistent with statutes or the Constitution. *Id.* at 9–10, 61 S.Ct. at 424. Moreover, if such rules are within the power delegated to the court, it has "the force of a federal statute." *Id.* at 13, 61 S.Ct. at 426; *see also Williams v. James,* 34 F.Supp. 61, 68 (W.D. La.1940) (Congress' adoption of rules amounts to congressional sanction or enactment—"the equivalent of a statute of Congress"). Thus, no separation of powers problem exists if the interpretation of Rule 4(f) adopted here is consistent with the power granted by Congress, essentially vesting the rule with the authority of a congressional statute.

An examination of the genesis of Rule 4(f) and its interpretation is instructive in this regard. Historically, the jurisdictional limits of a district court reached only to its territorial boundaries. A party living in the same state but in a different district could not be brought before the forum district court. Process could not be served outside the district, and it is through service of process that personal jurisdiction is obtained. As the Supreme Court stated:

Apart from specific exceptions created by Congress the jurisdiction of the district courts is territorial.

. . . . .

"In a civil suit *in personam* jurisdiction over the defendant, as distinguished from venue, implies, among other things, either voluntary appearance by him or service of process upon him at a place where the officer serving it has authority

---

**4.** 28 U.S.C. § 2072 (1982) provides:

The Supreme Court shall have the power to prescribe by general rules, the forms of process, writs, pleadings, and motions, and the practice and procedure of the district courts and courts of appeals of the United States in civil actions, including admiralty and maritime cases, and appeals therein, and the practice and procedure in proceedings for the review by the courts of appeals of decisions of the Tax Court of the United States and for the judicial review or enforcement of orders of administrative agencies, boards, commissions, and officers.

Such rules shall not abridge, enlarge or modify any substantive right and shall pre-serve the right of trial by jury as at common law and as declared by the Seventh Amendment to the Constitution.

Such rules shall not take effect until they have been reported to Congress by the Chief Justice at or after the beginning of a regular session thereof but not later than the first day of May, and until the expiration of ninety days after they have been thus reported.

All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect. Nothing in this title, anything therein to the contrary notwithstanding, shall in any way limit, supersede, or repeal any such rules heretofore prescribed by the Supreme Court.

to execute a writ of summons. Under the general provisions of law, a United States district court cannot issue process beyond the limits of the district, and a defendant in a civil suit can be subjected to its jurisdiction *in personam* only by service within the district. Such was the general rule established by the Judiciary Act of September 24, 1789, in accordance with the practice at the common law. And such has been the general rule ever since."

*Georgia v. Pennsylvania Railroad,* 324 U.S. 439, 467–68, 65 S.Ct. 716, 730–31, 89 L.Ed. 1051 (1945) (quoting *Robertson v. Railroad Labor Board,* 268 U.S. 619, 622–23, 45 S.Ct. 621, 622–23, 69 L.Ed. 1119 (1925)) (citations omitted).

When first promulgated, Rule 4(f) extended this common-law jurisdictional rule by providing, "All process other than a subpoena may be served anywhere within the territorial limits of the state in which the district court is held." [5] This rule was first interpreted by the Supreme Court in *Mississippi Publishing Corp. v. Murphree,* 326 U.S. 438, 66 S.Ct. 242, 90 L.Ed. 185 (1946), when a resident of the Northern District of Mississippi brought suit in that district against a Delaware corporation having an office and place of business in the Southern District of Mississippi. The defendant was served in the Southern District pursuant to Rule 4(f). In examining whether the Northern District of Mississippi could obtain personal jurisdiction over the defendant through Rule 4(f), the Court reiterated that "service of summons is the procedure by which a court having venue and jurisdiction of the subject matter of the suit asserts jurisdiction over the person of the party served." *Mississippi Publishing,* 326 U.S. at 444–45, 66 S.Ct. at 245–46. The Court then held that Rule 4(f) was a procedural rule and within the authority granted to the Supreme Court. Hence, Rule 4(f) lawfully operated to actually extend the territory in which the district court could exercise personal jurisdiction. It was not interpreted as Mr. Mowad would now have it interpreted, *i.e.,* as a rule merely describing effective service and not affecting amenability to suit.[6] The prior common-law rule regarding personal jurisdiction was considered superseded by Rule 4(f).

Rule 4(f) was amended in 1963 to include, among other things, the 100–mile bulge service provision for Rule 14 and Rule 19 parties in order "to promote the objective of enabling the court to determine entire controversies." Fed.R.Civ.P. 4 advisory committee note (notes of the committee on the 1963 amendments to Rule 4(f)). The Advisory Committee intended to again extend the territorial limits of personal jurisdiction through this provision.

> Any requirements of subject-matter jurisdiction and venue will still have to be satisfied as to the parties brought in, although these requirements will be eased in some instances when the parties can be regarded as "ancillary." ... The amendment is but a moderate extension of the territorial reach of Federal process and has ample practical justification.

*Id.* (citations omitted). Subsumed in the quoted passage is the implicit assumption that personal jurisdiction is satisfied through Rule 4(f), particularly in light of the rule twice noted above that effective service confers personal jurisdiction. This

---

**5.** The 100–mile bulge provision at issue here was not added until 1963.

**6.** An argument rejected by the Supreme Court in *Mississippi Publishing* is raised again by Mr. Mowad here. The defendant corporation in that case argued that the construction of Rule 4(f) adopted by the Court was inconsistent with Fed.R.Civ.P. 82, which provides that the rules "shall not be construed to extend or limit the jurisdiction of the United States district courts or the venue of actions therein." The Supreme Court held that Rule 82 refers to venue and

subject-matter jurisdiction "rather than the means of bringing the defendant before the court already having venue and jurisdiction of the subject matter." 326 U.S. at 445. We find it implausible to believe that the word "jurisdiction" in Rule 82 means subject-matter jurisdiction with respect to the first sentence of present Rule 4(f), which was the clause considered by the Court in *Mississippi Publishing,* and yet refers to personal jurisdiction when applied to the 100–mile bulge provision of that same rule.

assumption is consistent with the Rule 4(f) perspective inherent in the *Mississippi Publishing* opinion.

Moreover, this additional, limited extension of personal jurisdiction is within the delegated authority of the Supreme Court under the reasoning of *Mississippi Publishing.* The Court there said, "Congress could provide for service of process anywhere in the United States. Congress, having omitted so to direct, the omission was supplied by Rule 4(f) of the Rules of Civil Procedure...." 326 U.S. at 442–43, 66 S.Ct. at 244–45. (citations omitted). It would be anomalous to reason that—although effective service confers personal jurisdiction, although Congress has the power to provide for nationwide service, and although extension of service (and thus personal jurisdiction) in all cases from the territorial boundaries of the district to the state boundary was upheld by the Supreme Court—the further extension of service for certain parties to 100 miles from the courthouse (which may be beyond the state boundary) is not within the power delegated to the Supreme Court if interpreted to extend personal jurisdiction to that same 100–mile boundary. In *Mississippi Publishing*, Rule 4(f) was held to lawfully extend the reach of personal jurisdiction beyond the district. When the 100–mile bulge provision was added, Rule 4(f) did not suddenly mutate to merely a service statute. Just as before, the new rule extended the reach of personal jurisdiction.

That the forum state may not choose to exercise jurisdiction over the party in the same situation is no argument.

> The fact that the state, in which a federal district court sits, does not adopt that policy, insofar as its own state courts are concerned, cannot be permitted to affect the duty of a federal court, which is part of "an independent system for administering justice," to effectuate the federal policy enunciated in a rule whose constitutionality is established.

*McGonigle*, 49 F.R.D. at 62 (footnote omitted).

This is so, notwithstanding Judge Friendly's landmark opinion in *Arrowsmith v. United Press International*, 320 F.2d 219 (2d Cir.1963). That case held that amenability to suit in federal court in a diversity case should be determined under the forum state's law, "with 'federal law' entering the picture only for the purpose of deciding whether a state's assertion of jurisdiction contravenes a constitutional guarantee." *Id.* at 223 (footnote omitted). A cursory reading of the rule announced in *Arrowsmith* may lead one to conclude that a district court in a diversity case should only exercise personal jurisdiction over a party if the state courts could exercise jurisdiction. Such a rule would require affirmance in this case, since Mr. Mowad did not fall within the confines of the New Mexico long arm statute. However, a fuller reading of the case convinces us that this would not be the correct result.

*Arrowsmith* was decided in 1963, the very year of the Rule 4(f) amendment providing for service in the 100–mile bulge area. Footnote nine of the opinion states, "We ... express no opinion as to what standard is to govern when process is served outside the state under the 100–mile provision for certain types of litigation, added to F.R.Civ.Proc. 4(f) effective July 1, 1963." 320 F.2d at 228 n. 9. Notwithstanding this disclaimer, however, Judge Friendly's words in *Arrowsmith* evince the opinion that he later expressly adopted in *Coleman*— that nothing in *Arrowsmith* suggests the result advocated here by Mr. Mowad. *See Coleman*, 405 F.2d at 252. For example, he states in *Arrowsmith:*

> [W]e fully concede that the constitutional doctrine announced in *Erie R.R. v. Tompkins*, 304 U.S. 64, 78–80, 58 S.Ct. 817, 822–23, 82 L.Ed. 1188 (1938), would not prevent Congress or its rule-making delegate from authorizing a district court to assume jurisdiction over a foreign corporation in an ordinary diversity case although the state court would not.... But we find no federal policy that should lead federal courts in diversity cases to override valid state laws as to the subjection of foreign corporations to suit, *in*

*the absence of direction by federal statute or rule.*

.    .    .    .    .

[There is] *no federal policy* that makes it important to provide this Maryland plaintiff with a federal forum in Vermont, if Vermont itself would not entertain such an action. . . .

320 F.2d at 226–27 (emphasis added). In the case of Rule 14 and Rule 19 parties, there now *is* a federal rule justifying deviation from the forum state's standard in diversity cases. There is, in addition, a clear federal policy underlying the rule: "to allow complicated controversies to be ended by a single lawsuit if all the necessary third parties could be found within 100 miles of the courthouse." *Coleman,* 405 F.2d at 252. Thus, *Arrowsmith* is no obstacle to our holding in this case.

Finding, however, that the 100–mile bulge provision extends the personal jurisdiction territory of a district court beyond state lines and that such a rule is within the power delegated to the Supreme Court does not end the present inquiry. The provision, as interpreted here, must also comport with the constitutional guarantee of due process. Mr. Mowad argues that the constitutional due process requirement articulated in *International Shoe* and its progeny *always* requires minimum contacts with the forum state and that "efficiency of determining entire controversies in one proceeding cannot override the Constitutional requirement of due process." Third-Party Defendant-Appellee's Answer Brief at 14.

■ We disagree that *International Shoe* requires minimum contacts with the forum state, unless a state court, whose territorial boundaries are the state lines, is the forum at issue. In that case, the Court held that

due process requires only that in order to subject a defendant to a judgment *in personam,* if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not of-

fend "traditional notions of fair play and substantial justice."

326 U.S. at 316, 66 S.Ct. at 158 (citations omitted). The rule articulated was very precise: the party must have adequate minimum contacts with the *"territory of the forum,"* not necessarily with the state in which the court sits. That pre–1963 case (the year of the 100–mile bulge amendment), as well as most of its kind, involved a state court whose territorial limits were, in fact, the state boundaries. Hence, the minimum contacts inquiry was directed to activities within the state itself. Under Rule 4(f) as amended, however, the "territory of the forum" in the case of a federal district court is not defined by state lines with respect to Rule 14 and Rule 19 parties, and we can glean no compelling reason why it must be. Under the rationale of *International Shoe,* then, a federal district court may exercise personal jurisdiction over a Rule 14 or Rule 19 party if that party has sufficient minimum contacts with the area defined by a 100–mile radius from the courthouse, regardless of whether that limited area is within one state or spans several states.

We do not, as Mr. Mowad contends, find that efficiency can override the constitutional requirement of due process. Rather, we conclude that the Rule 4(f) territorial extension is modest enough, and its applicability to Rule 14 and Rule 19 parties narrow enough, that subjecting such parties to the jurisdiction of a court within 100 miles of an area with which they concededly have minimum contacts does not offend notions of fair play and substantial justice under due process scrutiny. Rule 4(f) is a narrowly tailored rule designed to implement an important federal policy—efficiency in the disposition of multi-party controversies.

■ There are, of course, limits to what will satisfy due process. As Professor Kaplan noted, "The amendment is certainly not intended to hold [a] corporation to judgment if the sole contact is the fact of service." Kaplan, *Amendments to the Federal Rules of Civil Procedure 1961–*

*1963*, 77 Harv.L.Rev. 601, 633 (1964).[7] In this case, however, due process is undoubtedly satisfied. Mr. Mowad was not only served process within the bulge territory, he also resided within the area and the automobile collision occurred within the region.

Therefore, we reverse the trial court's dismissal of Penn General's third-party complaint against Mr. Mowad and remand the case for trial. Because we reverse on this ground, we make no conclusion regarding Penn General's alternative appeal of the district court's denial of a motion to transfer the action to the district court located in El Paso, Texas. Whether the case should be tried in El Paso is a matter for the trial court to determine under notions of forum non conveniens.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

---

7. Mr. Mowad argues that if Rule 4(f) extends the territorial jurisdiction of the court in the case of Rule 14 and Rule 19 parties, as we hold, the further holding that a minimum contacts analysis must also be satisfied is nonsensical, since "the minimum contacts analysis comes into play only when a defendant is served *outside* the territorial jurisdiction of the trial court." Third-Party Defendant-Appellee's Answer Brief at 12 (emphasis in original). Professor Kaplan's observation, as well as the facts of *International Shoe*, demonstrate the fallacy of this assertion. Service can be made on a party within the territorial confines of a court's jurisdiction, yet exercise of personal jurisdiction based on such service can contravene due process because of a lack of sufficient minimum contacts with the court's jurisdictional territory. In *International Shoe*, a sales solicitor employed by the defendant was personally served within the forum state, 326 U.S. at 312, 66 S.Ct. at 156 yet a full minimum contacts analysis was undertaken by the Court. If sufficient minimum contacts had not been found in the case, the Court would have held that exercise of personal jurisdiction would violate due process, notwithstanding service of process within the territorial jurisdiction of the trial court. A two-step analysis is required: (1) has the party been effectively served pursuant to a valid statute or Rule, and (2) would the exercise of personal jurisdiction pursuant to such service offend due process because of a lack of sufficient minimum contacts with the territorial jurisdiction of the trial court?

Mr. Mowad himself implicitly recognized this two-tiered approach in a final, "slippery slope" argument which can be quickly dismissed. He states that if the Supreme Court

has the power to extend the territorial jurisdiction of the district courts as to third party defendants, there is nothing to prevent it from doing so as to original defendants. Therefore, ... the Supreme Court could at any time amend Rule 4 to permit all district courts' jurisdiction to extend to anywhere in the United States, and the only due process question in a diversity suit would be whether the defendant or third party defendant had adequate minimum contacts with the United States.

Third-Party Defendant-Appellee's Answer Brief at 5.

The short answer to his concern is that such a dire prediction has not been realized in the more than twenty years since the bulge provision was adopted, and such a scenario is not under review here. Insofar as we know, neither we nor the Supreme Court has ever invalidated a statute or rule which withstands constitutional scrutiny simply because it may be amended in the future so as to render it unconstitutional. The more thoughtful reply is that this script assumes that the Supreme Court can unilaterally amend the rules by fiat. As noted earlier, however, amendment would require congressional acquiescence. Assuming Congress would sanction such an amendment, the constitutionality of the rule would then, like any other congressional enactment, be subject to judicial review. As the Supreme Court noted in *Mississippi Publishing*, "The fact that this Court promulgated the rules as formulated and recommended by the Advisory Committee does not foreclose consideration of their validity, meaning or consistency." 326 U.S. at 444, 66 S.Ct. at 245. One cannot assume that the minimum contacts test would be the test utilized when the area at issue is the entire country rather than relatively small geographical units. Moreover, one should also not assume that the judicial branch would fail to carry out its constitutional duty to ensure that due process is observed.